**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Blair E. Reed (State Bar No. 316791)
Sean L. Litteral (State Bar No. 331985)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com
　　　　breed@bursor.com
　　　　slitteral@bursor.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL ONN, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CARRIER GLOBAL CORPORATION and WALTER KIDDE PORTABLE EQUIPMENT, INC. <br><br> Defendants. | Case No.  4:21-cv-02188-HSG <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff Daniel Onn ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendants Carrier Global Corporation ("Carrier Global") and Walter Kidde Portable Equipment, Inc., ("Kidde") (collectively "Defendants") for the manufacture, marketing, and sale of plastic handle fire extinguishers and push-button Pindicator fire extinguishers as identified below. Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF ACTION

1.      This is a class action against Defendants Carrier Global Corporation and Walter Kidde Portable Equipment, Inc. for the manufacture and sale of over 40 million plastic handle fire extinguishers and push-button Pindicator fire extinguishers (collectively, the "Products"), all of which suffered from the following defect in design: nozzles frequently becoming detached, becoming clogged, or requiring excessive force to discharge causing a failure to activate during a fire emergency (hereinafter the "Product Defect" or "Defect").  A fire extinguisher that fails to function properly during an emergency poses a threat to the life, safety, and property of the user and those in their immediate surroundings.  This Defect rendered the Products unsuitable for their principal and intended purpose.

2.      Plaintiff brings his claims against Defendants individually and on behalf of a class of all others similarly situated purchasers of the Products for (1) violation of California's Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et. seq*.; (2) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200-17210; (3) fraud; (4) unjust enrichment; (5) breach of implied warranty; and (6) violations of the Magnuson-Moss Warranty Act.

## PARTIES

3.      Plaintiff Daniel Onn is, and at all times relevant to this action has been, a resident of Saratoga, California.  In approximately the autumn of 2017, Plaintiff purchased a Kidde model 10BC fire extinguisher with a plastic handle for about $40.00 from The Home Depot located at 975 South De Anza Boulevard, San Jose, California, 95129.  Plaintiff purchased the Product because he

believed it was fit for use as a fire extinguisher.  However, the Product that Plaintiff purchased was not fit for use as a fire extinguisher due to a Product Defect causing it to fail to activate when needed.  Plaintiff would not have purchased the Product had he known that the Product was unfit to perform its intended purpose, rendering the Product useless.

4.     The Product's failure to activate occurred within a year after Plaintiff purchased the product.  In response to a fire in his kitchen, Plaintiff immediately reached for the fire extinguisher.  He pulled the pin to unlock the extinguisher and squeezed the handles to activate the flame-retardant spray, as the instructions directed.  But nothing happened.  The flames from the fire quickly leaped out toward him.  As the flames threatened both personal injury and property damage, Plaintiff ran to the sink in his kitchen, filled a large bucket of water, and threw it on the fire.  Shortly afterward, Plaintiff threw the fire extinguisher in the trash because he was afraid that it would malfunction again when needed.  Plaintiff disposed of the Product long before he ever contemplated litigation.

5.     Plaintiff reviewed the Product's packaging prior to purchase.  Defendants disclosed on the packaging that the Product was a fire extinguisher and described features typical of fire extinguishers but did not disclose the Defect.  Plaintiff would not have purchased the Product had there been a disclosure informing him that the Product was useless and unfit to perform its intended purpose.

6.     Defendant Carrier Global Corporation is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard in Palm Beach Gardens, Florida.  In 2020, Carrier Global, parent to over 80 brands across three sectors, including HVAC, refrigeration, and fire and security, generated $17.5 billion in net sales, and employed roughly 56,000 employees.

7.     Defendant Walter Kidde Portable Equipment, Inc. is one of Defendant Carrier Global's brands.  Kidde is a Delaware corporation with its headquarters located at 1016 Corporate Park Drive in Mebane, North Carolina.  Defendant manufactures, markets, and distributes the Products throughout the United States. Defendant sells the Products on its website and through third-party retailers such as Walmart, The Home Depot, and Amazon.

**JURISDICTION AND VENUE**

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendants.

9.      This Court has personal jurisdiction over Defendants because Defendants conduct substantial business within California such that Defendants have significant, continuous, and pervasive contacts with the State of California.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this District as Plaintiff purchased his Product in this District and resides in this District.

**COMMON FACTUAL ALLEGATIONS**

**I.      Fire Extinguishers Failing to Discharge**

      **A.      Despite Its Purported Commitment To Quality, Performance, And Responsibility, Defendants Knowingly Manufactured, Marketed, And Sold Defective Fire Extinguishers**

11.     As advertised, Carrier Global's "fire business encompasses a wide range of residential, commercial and industrial systems, including . . . fire, gas and water mist suppression and fire and gas safety solutions."[1]  Carrier Global's fire business is led by Kidde which describes itself as "one of the world's largest manufacturers of fire safety products . . . to protect people and property from fire and related hazards."[2]  In doing so, Kidde is purportedly "committed to ensuring [its] products are safe and dependable, especially those related to life safety such as . . . fire

---

[1] Carrier Global Corporation, "Carrier Fire Solutions: Protecting What Matters Most," *Fire & Security*, Available at https://www.carrier.com/fire-security/en/north-america/products-services/product-category-solutions/fire-solutions/ (last visited March 11, 2021).
[2] Walter Kidde Portable Equipment Inc., "About Kidde," Available at https://www.kidde.com/home-safety/en/us/about/ (last visited March 11, 2021).

extinguishers."[3]   To that end, Kidde proclaims that values such as quality, performance, and responsibility are among "the pillars of [its] business."[4]

12.     However, Kidde neglects to mention that it has received hundreds of complaints related to the propensity of its fire extinguishers to become clogged and to fail to discharge during fires.[5] This Product Defect has led to at least 16 reports of personal injury, including one fatality, and 91 reports of property damage.[6]

13.     With tens of millions of units sold at a price point of $12 to $200, Defendants profited enormously from their failure to disclose the Product Defect sooner.

14.     Defendants made partial representations to Plaintiff and Class Members, while suppressing the safety defect.   Specifically, by displaying the Products and describing their features, the Products' packaging implied that the Products were suitable for use as fire extinguishers, without disclosing that they had a critical safety-related defect that could inhibit the proper functioning of the device and lead to harm to users of the Products.

15.     The Products at issue are numerous.   Although sold under different brand names these fire extinguishers are substantially similar.   They all suffer from the same Defect involving their tendency to become clogged and to fail during fires. Each fire extinguisher substitutes important metal components such as the handle or push button for cheaper and less reliable plastic handles or plastic push buttons. Further, these fire extinguishers were sold for years despite Defendants' knowledge of the Defect, risking the personal health and safety of the consumer for corporate profits.   And these fire extinguishers, as discussed below, were subject to the same ineffective, sham recalls that left consumers uninformed and vulnerable.

---

[3] Walter Kidde Portable Equipment, Inc., "Product Safety," Available at https://www.kidde.com/home-safety/en/us/about/product-safety/ (last visited March 11, 2021).

[4] Walter Kidde Portable Equipment, Inc., "Kidde Core Values," Available at https://www.kidde.com/home-safety/en/us/about/corevalues/ (last visited March 11, 2021).

[5] Mary H.J. Farrell, "Kidde Recalls More Than 40 Million Fire Extinguishers," *Consumer Reports* (November 2, 2017), Available at https://www.consumerreports.org/fire-extinguishers/kidde-fire-extinguisher-recall/ (last visited March 11, 2021).

[6] *Id.*

**B.    Defendants' Defective Fire Extinguishers Risked The Lives, Safety, And Property Of Defendants' Consumers**

16.    The consequences of this Product Defect can be severe.  On March 18, 2017, one consumer, for example, submitted a report to the United States Consumer Products Safety Commission ("CPSC") concerning Kidde Model 1-A-10-BC.  He stated that "I was working with beeswax [when] materials caught fire."  In response, the consumer wrote that "I tried to put [out] the fire with the Kidde extinguisher[,] but it didn't work."  The consumer continued that "I had to get close to the fire to put it [out] with my jacket: as a result my jeans caught on fire and I ended up with a serious third-degree burn on my left leg."  Consequently, the consumer reported that he "underwent skin graft surgery all around my left leg."  He stated that he has "been recovering for almost one year[,]" but that "[i]f the extinguisher had worked I could have put [out] the fire without getting close to it."  Kidde was informed of this incident through the CPSC on April 6, 2017.  Kidde responded to this consumer's complaint stating that "[b]ased upon the information provided, we cannot determine why the fire extinguisher failed to deploy."

17.    On November 2, 2017, another consumer submitted a report to the CPSC concerning Kidde Model FA-110.  The consumer stated that his "gas stove caught on fire and my fire extinguisher did not work."  As a result, he reported that "my stove burned and my house filled with smoke.  The microwave above my stove was also ruined."  He stated that he "had to call the fire department" and only "[a]fter the incident, I found out that my (recently purchased) fire extinguisher had been recalled.  I had actually purchased it AFTER the recall."  Kidde was informed of this incident by the CPSC on December 4, 2017.  Kidde responded shortly afterwards.

18.    On November 17, 2017, another consumer submitted a report to the CPSC concerning Kidde Model FA-110.  He stated that "[a]n oven fire flared up during preheating, and my wife grabbed the Kidde fire extinguisher which is kept several feet away.  We believed this to be a smart purchase, and [a] great location."  The consumer noted that "[t]his was our first use of the extinguisher, and we have previously reviewed how to use it."  He reports that "I was upstairs, and heard her call for my help, and when I got halfway down the stairs I could see her depressing the lever multiple times, with no discharge from the extinguishers."  As a result, he "ran back

upstairs to grab some clothes to smother the flames . . . while attempting to not have the clothes catch on fire."  He reported that "[i]n the process the flames burned my right hand, but I had to continue subduing the flames.  Meanwhile[,] I was asking her to try different methods or angles with the extinguisher, but to no avail."  The consumer stated that "[f]inally, 1 puff of dry chemicals came out but it was not under proper pressure . . . the discharge caused no significant reduction in the flame, but instead sprayed our counter, cabinets, sink, etc. with a fine layer of dust."  Kidde was informed of this incident by the CPSC on December 5, 2017.  Kidde responded shortly thereafter.

19.     On December 1, 2017, another consumer submitted a report to the CPSC.  The consumer stated that "[m]y neighbors' house was on fire.  I recognized this and called 911, and ran over with my Kidde fire extinguisher."  The consumer stated that "[a]t this point the house was filled with smoke but there was a medium sized fire and I tried to put it out but the fire extinguisher would not deploy – the father / a strong man also tried but it did not work."  The consumer reported that "[l]uckily the firemen came about 3 minutes after we tried."  But this did not prevent the following disastrous outcome: "[t]he fire caused [$]100,000 of damages (so far)."  Kidde was informed of this incident by the CPSC which sent its report to Kidde on December 11, 2017.  Kidde responded shortly afterwards "apologiz[ing] for any inconvenience this has caused."

20.     On January 20, 2018, another consumer submitted a report to the CPSC.  The consumer stated that a "[s]mall fire was started from an old ember.  First fire extinguisher failed to discharge, the plastic handle just bent around the pin.  Eventually got it to work but fire had grown significantly in the 15 seconds of fiddling it took to get it to discharge."  The consumer stated that the "[e]xtinguisher only discharged about 50% of its contents.  Daughter ran inside the house for our other extinguisher.  It also failed to discharge and took fiddling because of the plastic handle while the fire grew."  The consumer stated that "[t]his [second] one did discharge all of its contents[,] but it was too late at this time, the fire grew and caught an adjacent field on fire resulting in minor structure damage and about 30 acres burned before the fire department could put it out."  The consumer concluded that he "[c]ould have stopped the fire early if the extinguisher had functioned properly."  Kidde was informed of this incident by the CPSC on February 9, 2018.  Kidde responded shortly afterwards "sincerely apologiz[ing] for the incident that occurred."

21.     On December 7, 2020, another consumer submitted a report to the CPSC concerning Kidde Model H110G.  The consumer stated that he "had what started as a minor grease fire on our kitchen stove . . . my wife then attempted to use the Kidde ABC fire extinguisher nearby but upon pulling the pin and squeezing the trigger, nothing happened."  In turn, he "attempted as well, [but] to no avail.  My wife was evacuating our two daughters and dog from the house and I was starting to dial 911 when I remembered I had another extinguisher [nearby]."  So, he "grabbed it, returned within 30 seconds, and successfully put out the fire that had quickly grown to close to ceiling height."  The consumer stated that "[u]nfortunately, the time lost allowed the fire to burn far longer than it would have, had our extinguisher worked properly."  He reported that "[a]s a direct result of the failure, our stove's control partially melted and the smoke damage to our ceiling is going to require the mineral fiber tiles to be replaced."  The consumer continued that he is "left with what I would estimate to be $1,200 in property damage."  Significantly, after the event the consumer "looked into why the extinguisher failed and found that the U.S. Consumer Product Safety Commission had issued a recall [in 2017] 'due to a failure to discharge and nozzle detachment.'"  Kidde was informed of this incident by the CPSC on December 23, 2020.  Kidde responded shortly afterwards noting that "[a]ny claim for property damage would be properly handled through the homeowner's insurance carrier."

**C.     Defendants' Defective Fire Extinguishers Include More Than 134 Models Totaling Nearly 40 Million Devices In All**

22.     The Products at issue include several models that have been recalled.  As demonstrated above and further below, Defendants' recall was totally ineffective at remedying the problems herein discussed.  **Tens of thousands, if not hundreds of thousands of consumers, have not been informed of Defendants' recalls and are still at risk.**  The models at issue include:

///

///

///

///

**Models Manufactured July 23, 2013 – October 15, 2014**

| 10BC | 1-A-10BC | 1A 10BCW | 2A10BC |
|------|----------|----------|--------|
| 5BC | 5BCW | FA110G | FA110 |
| FA5B | FC110 | FC5 | FH/RESSP |
| FX10 | FX10BC | FX10K | FX210 |
| FX210R | FX210W | FX340GW | FX340SC |
| FX5II | KFH Twin | M110 Twin | M5 Twin |
| Mariner 10 | Mariner 110 | Mariner 5 | Mariner 5G |
| XL5MR | | | |

**Models Manufactured Between July 2, 2012 – August 15, 2017**

| AUTO FX5 II-1 | FC5 | M10G | FA10G |
|---------------|-----|------|-------|
| FS110 | M10GM | FA10T | FS110 |
| M110G | FA110G | FS5 | M110GM |
| FA5-1 | FX10K | M5G | FA5G |
| FX5 II | M5GM | FC10 | H110G |
| RESSP | FC110 | H5G | |

**Additional Recent Models**

| KK2 | 100D | 210D | 210D-1 |
|-----|------|------|--------|
| H110G | Home 110 | FX340SC-2 | Pro 5 TCM-8 |
| FX110E | FX340G | FA110G | FA10 |
| FX340GW-2 | | | |

23.     For models suffering from the same Product Defect that have yet to be recalled, and for which there is limited information publicly available, Plaintiff reserve the right to amend his complaint to reflect these additional models at the time of discovery.

**II.     Defendants' Sham And Ineffective Recalls**

   **A.     Despite Knowledge Of The Product Defect, Defendants Dragged Their Feet, Incurring Civil Penalties**

24.     On February 12, 2015, Kidde issued a recall involving 31 models of Kidde fire extinguishers manufactured between July 23, 2013 through October 15, 2014.  This recall involved a total of nearly 4.6 million units in the United States.[7]

---

[7] U.S. Consumer Product Safety Commission, "Kidde Recalls Disposable Plastic Fire Extinguishers Due to Failure to Discharge," (February 12, 2015), Available at https://www.cpsc.gov/recalls/2015/kidde-recalls-disposable-plastic-fire-extinguishers/# (last visited March 11, 2021).

25.     Kidde's February 12, 2015 recall was woefully inadequate considering the severity of the problems discussed herein.  Consumers who put their faith in Kidde's ability to manufacture high-quality firefighting products were led to believe that the equipment they purchased could keep them safe in life-threatening fires.  Instead, consumers had to learn the hard way and in times of crisis that the fire extinguishers they purchased were defective.  And, for a period of two-and-a-half additional years until Kidde issued its November 2, 2017 recall, over 32 million defective fire extinguishers remained in the marketplace and were purchased and relied upon by at-home consumers.

26.     In December 2015, the U.S. Department of Justice ("DOJ") along with the Consumer Product Safety Commission ("CPSC") filed a complaint against Kidde for failing to inform the CSPC in a timely manner about problems associated with Kidde's fire extinguishers.[8] The DOJ alleged that before the 2015 recall, Kidde significantly underreported "the scope and nature of the defect and risk, and the number of products and models affected."[9]

27.     In response, Kidde issued another recall in 2017 for nearly 38 million plastic-handle and push-button Pindicator fire extinguishers in the U.S., implicating 134 models produced as far back as 1973.[10]  Many of these models are set out above.  In addition, Kidde was ordered to pay a $12 million civil penalty in connection with the allegations that the company failed to timely inform the CPSC about problems with the fire extinguishers it manufactured.[11]

---

[8] Ryan Felton and Rachel Rabkin Peachman, "Kidde Mishandled Problems With Its Fire Extinguishers for Years as Homes Burned and Injuries Mounted," Consumer Reports (January 12, 2021), Available at https://www.consumerreports.org/product-safety/kidde-mishandled-problems-with-fire-extinguishers-for-years/#:~:text=Kidde%20eventually%20filed%20a%20new,require%20excessive%20force%20to%20discharge. (last visited March 11,2021).

[9] *Id.*

[10] U.S. Consumer Product Safety Commission, "Kidde Recalls Fire Extinguisher with Plastic Handles Due to Failure to Discharge and Nozzle Detachment: One Death Reported," Available at https://www.cpsc.gov/Recalls/2017/kidde-recalls-fire-extinguishers-with-plastic-handles-due-to-failure-to-discharge-and# (last visited March 11, 2021).

[11] U.S. Department of Justice, "Fire Extinguisher Manufacturer Ordered to Pay $12 Million Penalty for Delay and Misrepresentations in Reporting Product Defects," *Justice News*, Available at https://www.justice.gov/opa/pr/fire-extinguisher-manufacturer-ordered-pay-12-million-penalty-delay-and-misrepresentations

28.     The recall allowed Kidde to say it was doing right by consumers, but in fact the recall protected Kidde's profits by suppressing returns.  As a Consumer Reports' article notes, "[d]espite the 2017 announcement, many people seem to not have heard about the recall."[12] Further, "[s]everal incident reports reviewed by [Consumer Reports], for example, involve Kidde fire extinguishers that had already been recalled."[13]

**B.      Many Consumers Were Unable To Contact Kidde To Secure Their Replacement Despite Following The Procedures Set Out By Kidde**

29.     Several customers who were informed of the recall were either unable to establish contact with Kidde despite repeated attempts or encountered issues with the website or customer service.  One consumer wrote to Consumer Reports in 2018 stating that the "recall site won't allow me to enter information such as model number."  The consumer continued that the "[i]nformation page seems to be dead."

30.     Another consumer reported to Consumer Reports in 2018 that she "entered four units on the appropriate Kidde Product Safety Recall page . . . but the page does not include any button or other method to send the page to the company."

31.     Another consumer reported to Consumer Reports in 2018 that she "ha[s] been waiting two months for my replacement."  She reported that "[p]honing is impossible, on hold forever."  She concluded that she "[w]ould like an honest answer from the company."

32.     Another consumer reported to Consumer Reports in 2018 that they "have been waiting since Nov[ember] 10 for the replacements."  The consumer stated that they "contacted [Kidde] by email and phone."  The consumer concluded that they "would just like a straight answer from [Kidde]."

33.     Another consumer reported to Consumer Reports in 2018 that they are "[n]ot sure [Kidde is] taking this recall seriously."  The consumer reported that they were "told [the] replacement extinguisher would be sent out back in Nov[ember] and nothing."  The consumer called Kidde the day before making their report "and [Kidde] couldn't even find me in their

---

[12] *See supra* n. 8.

[13] *Id.*

system." The consumer concluded that the "[l]ady said she'd call . . . right back and never did . . . so taking things seriously? I think not." Another consumer responded "[t]his is exactly what happened to me. What do we do now?"

34.     Another consumer wrote to the Better Business Bureau (hereinafter "BBB") on June 7, 2018 that they "have 4 fire extinguishers that were part of the recall from the fall of 2017. I contacted Kidde within the first week after the recall to determine what needed to be done [to] receive replacements. I still have not received my [replacement]." Following up, the consumer "contact[ed] [Kidde] through the recall phone number given at least 8 times since the recall and have repeatedly had to re-confirm all my information, re-confirm all my fire extinguishers, and then have been told I would be receiving the new ones." But, the consumer wrote, "[t]hey have never shown up." The consumer then provided their case reference number and wrote that "both [extinguishers] confirmed recalled for failure to deploy." Kidde was informed of this complaint by the BBB on the same day.[14] Kidde also responded that same day.

35.     Another consumer reported to the BBB on July 3, 2018 that they "had three fire extinguishers subject to the current Kidde recall." The consumer "submitted a claim . . . to get the three fire extinguishers replaced in the fall of 2017. [But] [t]he replacement fire extinguishers[s] have not arrived." The consumer stated that "[e]ach time I called to follow up on the status of the replacement extinguishers, I was transferred to another person who said they would call back." However, the consumer wrote that they "did not receive a call" and "still do not have the replacement extinguishers." Kidde was informed of this complaint by the BBB on the same day. Kidde also responded that same day stating that it "will contact [the] consumer today."

36.     Another consumer reported to the BBB on August 17, 2018 that their "first call [to Kidde] was 11-03-17." The consumer then "made follow up calls 12-19-17, 02-28-18, and 05-01-18" and "also spoke to someone at Kidde [on] 5-01-18." The consumer reported that "[e]ach time I was told varying time frames for replacement fire extinguishers to arrive. Each time they would say they were missing some information at the previous call. Each time they would create a new

---

[14] Better Business Bureau, "What Complaints Do We Handle?" Online Complaint System, Available at https://www.bbb.org/consumer-complaints/file-a-complaint/get-started (last visited March 15, 2021).

1    reference [number]."   But the consumer "received neither of the two fire extinguishers [Kidde]

2    acknowledge were part of the safety recall."   Kidde was informed of this complaint by the BBB

3    within two business days of the complaint.   Kidde responded on August 21, 2018 that it "will look

4    into this issue."

5           37.     Another consumer reported to the BBB on July 24, 2020 – more than two years after

6    the recall – that after "[f]inding there is a recall on my Kidde fire extinguisher, I attempted, and

7    failed to contact Kidde by these means: 1. [u]sing Kidde's online webmail (there is no email

8    address listed), I filled out my request."   The consumer stated that "[b]ut when I pressed 'Send,' the

9    site did not respond."   The consumer "tried again.   No response. (I have no problem currently

10   sending webmail to other sites, as [the BBB's] receipt of this webmail shows!)."   The consumer

11   continued "2. I phone the number on Kidde's site and pressed the 'I have a recall' option.   No one

12   answered.   I called back and tried general customer support with the same non-response."   The

13   consumer concludes that they are "distressed insufficient notice was given at the time of the recall,

14   as I have been relying on a defective product as a result."   Kidde was informed of this complaint by

15   the BBB within two business days of the complaint.   Kidde responded on July 27, 2020

16   "apologiz[ing] for [the consumer's] inconvenience."

17          **C.**     **Other Consumers Experienced Significant Delays Securing A Replacement**

18          38.     For those consumers who did not cave to Kidde's test of exhaustion, many were,

19   nonetheless, met with significant delays in securing their replacement.

20          39.     One consumer wrote to Consumer Reports in 2019 that he "put my claim in twice

21   since the day the recall was announced."   But he stated that "I have heard nothing."   He concluded

22   that "I suppose my house must burn down before they send a replacement."

23          40.     Another consumer reported to Consumer Reports in 2018 that he "[p]ut [his] recall

24   request in [in] November 2017.   It is now March 25, 2018."   He concluded that "someone should

25   do a follow-up article exposing this fraud."

26

27

28

41.    Another consumer reported to Consumer Reports in 2018 that "[i]t has been 5 months now since I requested a replacement Fire Extinguisher[,] and nothing has happened."  She concluded "[w]hat do I have to do now?????"

42.    Another consumer reported to Consumer Reports in 2018 that he is "[s]till waiting . . . five months since submitting claim and long times on hold only to be disconnected."  He concluded that he is "[g]lad to see it's not personal."

43.    Another consumer reported to Consumer Reports in 2018 that it is "March 19 . . . still waiting for the five units we submitted claim for on November 2 . . . no response whatsoever to repeated emails which included the ID # for claim."

44.    Another consumer reported to Consumer Reports in 2018 that he "submitted a claim and for several months [Kidde] made excuses, but now you can only reach the call center for rebates.  They say you can submit another claim otherwise [they] cannot help you!"  The consumer concluded that "this recall is a joke and nothing will get done!!!!"

45.    Another consumer reported to Consumer Reports in 2019 that "I put my claim [in] more than a year ago.  When you call, you are on a hold for an hour or long[er].  When someone answers they simply lie, e.g., server is down, [or they] need to check and get back to you in 24 hours and so on."  The consumer reported that "[n]o one ever calls.  Why do they lie?  Just tell us that you are not going to replace it."  The consumer concluded that the "FTC should get after them, and fine this company for announcing a recall and won't fulfill."

**D.    Several Of The Fortunate Few Who Received Replacements Were Supplied With Either An Inferior Product, A Damaged Product, Or Another Recalled Product**

46.    Several of the consumers who succeeded in Kidde's marathon of endurance and setbacks were rewarded with an inferior product than that which they intended to purchase, or their recalled product was replaced with an otherwise malfunctioning product, or even worse, their recalled product was replaced with *another* of Kidde's recalled products.

47.    One consumer wrote to Consumer Reports in 2018 that after following through with Kidde's recall process, "I was sent a discharged extinguisher with no pin."  He stated that "I will keep [the recalled product] and send back the empty extinguisher [Kidde] sent me."

48.     Another consumer reported to Consumer Reports in 2018 that "I received the replacement for one of the two fire extinguishers affected by the recall.  The one being replaced is a model FX210R with a 4A40BC rating.  The one I received is a Model FX210 with a 2A10BC rating."  He stated that "[t]o me that means that I only get ¼ of the area for a flaming fire with the replacement one."  To remedy this situation, the consumer reported that "I have called Kidde twice and left messages with the answering service who said someone would call me back[,] but I have not received any return call."  The consumer concluded that Kidde's "customer service is not very good."

49.     Another consumer reported to Consumer Reports in 2018 that "I received my replacement Kidde fire extinguisher today.  It was immediately apparent that the replacement extinguisher is significantly smaller than my original."  The consumer stated that "[m]y original had a tank that was 14.5 inches tall and the replacement tank is only 12 inches tall.  Diameter and pressure are the same.  So that means the capacity of the replacement is 17% smaller!"  He continued that "[i]n addition, the extinguisher I had was rechargeable, the replacement is not.  Looking at the product catalog, I see they have a Pro 110 version which is much closer to what I had (Home 110) but instead they replaced my extinguisher with a smaller and cheaper version."  The consumer concluded that "I called them 2 days ago and was told I would receive a call back but no call.  What is my recourse?"

50.     Another consumer reported to the CPSC on November 17, 2017 that "I just received two replacement Kidde fire extinguishers as part of the recall.  One of my units arrived covered in powder, safety pin removed and at empty state according to the pressure monitor."  The consumer stated that "I am not sure if the chemicals I've touched are dangerous and if my other unit is safe."  Kidde was informed of this consumer's complaint by the CPSC on December 19, 2017.  Kidde responded that it "reached out to [the consumer] to discuss his concerns."

51.     Another consumer reported to the CPSC on December 12, 2017 that "I just wanted to let you know about this ridiculous Kidde fire extinguisher recall.  I got my replacement from them yesterday after waiting about three weeks (good thing there wasn't a fire in that long time)."  The consumer continued that "I don't trust them and was concerned they sent me one with the

same model number[,] so I called them to verify they didn't send me a recalled one.  He checked the serial number and they did."  The consumer stated that "[t]hey sent me a recalled fire extinguisher to replace a recalled one.  And since they screwed up the guy at the call center . . . couldn't even send me a new one.  He had to escalate it so an actual Kidde employee will call me back."  The consumer reported that "[h]e said to call back if I don't hear from them in a week.  So that will be a month without a working fire extinguisher plus probably another three weeks to get the replacement sent which may or may not be recalled."  The consumer concluded that Kidde "need[s] to get fined or something.  They can't send a recalled item to replace a recalled item and take forever in doing so when it is an item people rely on for safety."  Kidde was informed of this consumer's complaint twice: once by the consumer and once by the CPSC on January 17, 2018. Interestingly, Kidde responded that "[i]f this consumer needs to use the recalled fire extinguisher, while waiting for the replacement, they should do so."

52.     Another consumer reported to the CPSC on December 13, 2017 that "I have three Kidde Home fire extinguishers that were on the recall list[,] so I called the number which I was given to get placement ones (it's only a call center), I was sent two of the three replacements which were on empty."  The consumer stated that "I have called three times to get the new ones replace[d] also and to receive my third original replacement but was told I had to wait until some[one] called me back."  The consumer noted that "this started in November and to date [I] have never heard from anyone[;] right now I have three extinguishers which are defective and two new ones that are empty."  The consumer concluded that "hopefully I don't have a fire in my house while I am waiting around for Kidde to respond."  Kidde was informed of this consumer's complaint twice: once by the consumer and again by the CPSC on January 17, 2018.  Kidde responded that it "will be reaching out to . . . discuss the replacement units."

53.     Another consumer reported to the CPSC on December 30, 2017 that "I made a submission to Kidde and was promptly shipped a replacement.  Unfortunately, what they sent me was a damaged and unusable extinguisher."  The consumer stated that "[a]fter I reported the problem with the replacement to Kidde . . . they have ignored me."  The consumer concluded "I don't think this is the way a recall is supposed to work."  Kidde was informed of this consumer's

complaint twice: once by the consumer and again by the CPSC on January 17, 2018.  Kidde responded that it "will be reaching out . . . to discuss the replacement."

54.     Another consumer reported to the CPSC on January 12, 2018 that "[a] Kidde fire extinguisher which I purchased was recalled two years after I purchased it.  [Kidde] sent me a replacement.  Now, one year later, they informed me that the replacement is recalled."  The consumer stated that Kidde "said they would send me a new one; it took them three months to do so."  The consumer continued that "[w]hen I received the new fire extinguisher the gauge was on empty.  In other words, they sent me a faulty extinguisher to replace the faulty extinguisher they had sent me to replace the original faulty extinguisher."  The consumer reported that "[i]n addition, I checked the other Kidde extinguisher which I had purchased at the same time as the first one, and the gauge is on empty.  This extinguisher [is] several years away from the expiration of Kidde's warranty.  And this extinguisher was not part of any recall."  The consumer concluded that "[i]t seems to me that this company should be investigated and that all consumers should be advised to check the gauge on their Kidde extinguishers on a regular basis."  Kidde was informed of this complaint twice: once by the consumer and again by the CPSC on January 23, 2018.  Kidde responded that it "would invite the individual making this report to contact" customer service.

55.     Another consumer reported to the CPSC on February 3, 2018 that "I did everything needed to have one of my extinguishers replaced through the recall.  Unfortunately, the replacement unit I was sent was damaged before I received it."  The consumer stated that "[a]ll of my attempts via phone and email to contact Kidde to remedy the situation have gone unanswered. I am concerned that I now have two unsafe fire extinguishers, and I don't know how to proceed." Kidde was informed of this complaint by the CPSC on May 7, 2018.  Kidde responded that it "would invite the individual making this report to contact" customer service.

56.     Another consumer reported to the CPSC on May 24, 2018 that his "Kidde Fire extinguisher was recalled.  Got replacement unit, however it was defective on arrival."  He stated that the "[y]ellow retardant material / powder was already leaking from the box.  This was extremely unfortunate as I just happened to have brought home my ~8 month [infant] from the

hospital with chronic lung disease." The consumer the also included the following photographs with their complaint:

 

Kidde was informed of this complaint by the CPSC on August 15, 2018. Kidde responded that it "will be reaching out to [the consumer] to [e]nsure that his fulfillment requests have been satisfied."

### III. Defendants' Pre-Sale Knowledge Of The Defect
#### A. Defendants Received Complaints Directly From Consumers And Through The CPSC Before The 2017 Recall

57. For at least five years before issuing their encompassing 2017 recall, Defendants received reports of the plastic handle fire extinguishers and push-button Pindicator fire extinguishers frequently becoming detached, becoming clogged, or requiring excessive force to discharge causing a failure to activate during a fire emergency.

58. As demonstrated above, the United States Consumer Products Safety Commission operates a website where consumers can post complaints about unsafe products and provide details about any incidents they experienced.

59. Online safety reports to the CPSC show that Defendants knew or should have known of the Product Defect since at least 2012, yet it continued to sell the defective products anyway.

60.     Per federal regulations, all safety reports that are submitted online through the CSPC website are sent directly to the product's manufacturer.  As set forth in more detail below, the CPSC website indicates that all safety complaints referenced herein were sent to Kidde, including the dates on which they were sent.  Defendants also monitor safety complaints from the CPSC, and thus Defendants would have independently become aware of each safety reported referenced herein separate and apart from notice received from the CPSC.

61.     On December 31, 2012, a consumer submitted a report to the CPSC concerning Kidde Model FA110.  The consumer stated that he "was cooking on November 8th, 2012 . . . when a small grease fire began building with flames of approx[imately] 6-12' high, causing me to grab [a] fire extinguisher to put it out."  He stated that he "removed the safety pin, verified the pressure indicator was green[,] pressed on the lever[,] but nothing came out."  The consumer stated that he "kept trying for approximately a minute longer pressing on [the] lever over and over[,] but nothing was coming out to end the fire."  The consumer stated that "there have been no injuries, but there was about $1000 worth of fire damages that could have been averted had this fire extinguisher worked."  The consumer stated that he independently contacted and alerted Kidde about this Product Defect.  The CPSC also sent the report to Kidde on February 15, 2013.  Kidde responded shortly afterwards.  Hence, Kidde was alerted twice about this incident – once by the consumer directly and then against later by the CPSC.  Kidde responded instructing the consumer to "contact [the] customer service manager."

62.     On August 10, 2013, another consumer submitted a report to the CPSC concerning Kidde Model H110G.  The consumer stated that his "pick up truck caught on fire on August 8, 2013."  He stated that "I grabbed my fire extinguisher (that has never been used before) and pulled the tab and squeezed the trigger."  The consumer noted that "[a] very small amount of chemical came out and the gauge then read empty, however it [was] still full."  As a consequence of this failure, the consumer reported that "[t]he cab of my truck went up in flames and is now totaled." The consumer attached the following photograph of his truck:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



The CPSC sent this complaint to Kidde on August 19, 2013.  Kidde responded, stating that "[b]ased on a review of the information provided here, Kidde does not have sufficient information to believe that the specific product concerns suggest a defect that presents a substantial product hazard."

        63.     On November 5, 2014, a Fire Department submitted a report to the CPSC concerning Kidde Model FX340SC-2.  A representative of the Department stated that the Department "responded to a fire at an apartment complex."  That "[t]he occupant had tried to use a fire extinguisher and it would not function."  The representative stated that "[a]bout 8 other fire extinguishers were tried and none of them worked" despite the fact that "[a]ll the extinguishers were new."  The representative "advised that the extinguishers malfunctioned due to the plastic discharging mechanism not working" and further that "[t]he plastic handle was not strong enough to depress the discharge piston before collapsing."  The CPSC sent this report to Kidde on December 4, 2014.  Kidde responded that "[b]ased on the information provided to date, Kidde is unable to determine if the particular incident described involved a defect."

64.     On March 10, 2015, another Fire Department submitted a report to the CPSC concerning Kidde Model Pro 5 TCM-8.  A representative of the Department stated that "[t]he department responded to a report of an outside fire at a retail grocery store. The Ambulance was the first unit to arrive and found . . . cardboard on fire against the exterior of the store."  The representative noted that "[t]he staff on the ambulance deployed the fire extinguisher from the ambulance in an attempt to extinguish, if not at least slow the fire until the arrival of the [Fire] Engine."  The representative continued that "[t]he firefighter pulled the pin, removed the hose and squeezed the handle.  After somewhat of a brief delay the powder 'dribbled' out [of] the end of the hose."  The fire fighter "looked at the gauge which was still showing in the green.  She again squeezed the handle and the agent slowly left the hose.  She attempted to shake the hose towards the flames to get any powder to be useful."  Eventually the Fire Engine arrived mitigating the circumstance.  The representative noted that "[t]his situation ended without injury or major property damage but could easily have ended differently should it [have] occurred in a structure or confined space, or [had there been] trapped occupants."  The CPSC sent this report to Kidde on March 25, 2015.  Kidde responded that it "is in the process of investigating this report."

65.     On March 23, 2015, another consumer submitted a report to the CPSC concerning Kidde Model H110G.  The consumer stated that "I attempted to use my Kidde Fire Extinguisher on a brush fire at a neighbor's home."  He noted that he "depressed the plastic lever one time which worked."  But "[t]he second time I tried, it was impossible to depress it.  Another one could not be operated at all. The lever could not be depressed.  Striking it on a tree or rock was the only way to depress the valve."  The CPSC sent this report to Kidde on March 30, 2015.  Kidde responded to this consumer's complaint shortly afterwards.

66.     On August 14, 2015, another consumer submitted a report to the CPSC concerning Kidde Model FX340SC-2.  The consumer stated that "I had a small fire in my house."  He noted that "I proceeded to use my Kidde fire extinguisher for the first time to put it out.  The tank capacity point[ed] to full as it was never used before.  After I pulled out the pin and squeezed the lever, the extinguisher puffed once and died."  The consumer continued "[i]f the fire was larger or spread faster, it would [have] put my family's life in danger."  The CPSC sent this report to Kidde

on August 24, 2015.  Kidde responded inviting the consumer to contact the customer service center.

67.     On August 18, 2015, another consumer submitted a report to the CPSC concerning Kidde Model FA110.  The consumer reported that "[d]uring annual fire extinguisher training we are required to put out a controlled fire.  I pulled [the] pin and gave a short burst of extinguisher.  I then proceeded to approach [the] base of fire and attempted to discharge the remainder of the bottle and nothing happened."  The consumer stated that "[s]queezing the handle did nothing, it appears the valve is stuck.  I had fire fighter person[nel] try also and nothing."  The CPSC sent this report to Kidde on August 26, 2015.  Kidde responded "invit[ing] the individual making this report . . . to please contact [the] customer service center."

68.     On April 13, 2017, a Fire Investigator submitted a report to the CPSC concerning a defective extinguisher.  The Fire Investigator stated that "[o]n April 12, 2017, 2350hrs, there was a kitchen fire I investigated.  The occupant of the residence attempted to use a Kidde 3lb disposable fire extinguisher and it failed to operate."  The Fire Investigator stated that "[t]he date stamp on the base of the extinguisher was '2015.'  The extinguisher was rated for ABC type fires and contained a number on the label of 'A99014677.'  This model extinguisher appears to be the same type of a recall previously issued on extinguishers made up to 2014."  The Fire Investigator stated that "I attempted to use the extinguisher to see if I could get it to operate and I was unable to squeeze the handle to activate the extinguisher.  The pin had been pulled . . . As a result of the inoperability of the extinguisher, an occupant of the residence used water to extinguisher a cooking oil fire and as a result spread the fire."  The Fire Investigator continued that "upon my examination of the extinguisher I noticed a piece of plastic on the upper handle that is to extend into a hole in the lower handle; in my attempt to activate the extinguisher, I had to manually manipulate this protruding piece of plastic into the lower handle."  The Fire Investigator concluded that "[t]his utilized a fine motor skill that, I believe a normal person would not be able to perform under a high stress situation as a fire."  Kidde was informed of this incident by the CPSC on July 18, 2017.  Kidde responded that it is "unable to determine what may have caused the alleged failure."

69.     Every time the CPSC's website describes a consumer complaint, the website also discloses the date when CPSC sent that complaint to the manufacturer. This is separate from the portion of the safety complaint where the consumer states whether he or she independently contacted the manufacturer.  As alleged above, all of the above-referenced complaints were sent to Defendants by CPSC shortly after being submitted to the CPSC.

70.     For each of the following reasons, Kidde's management knew or should have known about the complaints referenced above as soon as they began appearing on the CPSC website in 2012:

(a)     First, as noted above, Kidde was repeatedly contacted directly by consumers and by the CPSC about the same problem.

(b)     Second, the CPSC website is a government-run repository for complaints about safety-related defects, and many of Kidde's products appear on the website.  The CPSC website can provide businesses with early warnings of product defects, and monitoring reports is easy because users can search for reports by company names.  Hence, since at least 2012, it required negligible effort for Kidde's management and other personnel to visit the CPSC website, type "Kidde" in the search field, and view a list of reports of safety incidents related to Kidde products, including reports about the Product Defect at issue here.

(c)     Third, Kidde knows about the CPSC website because for each of the reports described above, Kidde registered a response.  For example, with regards to the first incident described and reported on December 31, 2012, Kidde responded that the consumer should contact customer service.

(d)     Fourth, for each of the recalls pertaining to the Defective Products, Kidde has a hard-to-locate tab on its website linking consumers to details of the recall as posted on the CPSC's website.

71.     Despite Kidde's knowledge of these complaints, Kidde continued to manufacture, market, and sell these defective products for purchase for five additional years from the date of the first reported complaint on the CPSC website.  This does not include numerous complaints that were only made to Kidde and were not otherwise publicly disclosed.  Nonetheless, only on

November 2, 2017 did Kidde issue a recall on these Defective Products.  And, even then, Kidde underreported the extent of these defects.

**B.     Other Indicia Of Defendants' Pre-Sale Knowledge**

72.     In addition to receiving safety complaints from the CPSC, Defendants also knew or should have known about the defects from several other sources.  First, online reputation management (commonly called "ORM" for short), is now a standard business practice among most major companies and entails monitoring consumer forums, social media, and other sources on the internet where consumers can review or comment on products.  "Specifically, [online] reputation management involves the monitoring of the reputation of an individual or a brand on the internet, addressing content which is potentially damaging to it, and using customer feedback to try to solve problems before the damage to the individual's or brand's reputation."[15]   Many companies offer ORM consulting services for businesses.

73.     Like most companies, Defendants presumably care about their reputation and regularly monitor on-line consumer reviews because they provide valuable data regarding quality control issues, customer satisfaction, and marketing analytics.  Reviews like those copied above would be particularly attention-grabbing for Defendants' management because extreme reviews are sometimes the result of extreme problems, and – just like any other company – Defendants are presumably sensitive to the reputational impact of negative online reviews.  Hence, Defendants' management knew or should have known about the above-referenced consumer complaints shortly after each complaint was posted online.

74.     Defendants' management also knew or should have known about the Product Defect because of the similarity of complaints to the CPSC, the Better Business Bureau, Consumer Reports, and other websites.  The fact that so many consumers made similar complaints about the same product indicates that the complaints were not the result of user error or an anomalous incident, but instead a systematic problem with the product.  Here, the reports and complaints from consumers – whether made directly to Defendants employees or forwarded from the CPSC – were

---

[15] WebSolutions Maine, "Online Reputation," Available at https://websolutions-maine.com/online-reputation/ (last visited March 15, 2021).

similar enough to put Defendants' management on notice that the incidents described were the result of a defect, and that the Products were experiencing unusually high levels of complaints about the nozzles frequently becoming detached, becoming clogged, or requiring excessive force to discharge causing a failure to activate during a fire emergency.

75.     If Defendants were not made aware of the Product Defect through the above sources – they were – Defendants also would have learned through court filings.  Since at least 2012, several complaints have been filed against Defendants by plaintiffs in their individual capacities alleging the Defect described herein.  Descriptions contained in those complaints and information learned through discovery therefore would have disclosed the Defect.

## **TOLLING OF THE STATUTE OF LIMITATIONS**

76.     Any applicable statute of limitations has been tolled by the deceptive conduct alleged herein.  Through no fault or lack of diligence, Plaintiff and Class members were deceived regarding the Product Defect and could not reasonably discovery the latent nature of the defect.

77.     Plaintiff and Class members could not reasonably discover Defendants' deception with respect to the Product Defect prior to experiencing a failure and/or being informed of the reason for the failure.  Within the time period of any applicable statute of limitations, Plaintiff and Class members could not have discovered through the exercise of reasonable diligence that Defendants were concealing the Product Defect.

78.     Plaintiff and Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were concealing a latent defect and/or that the Defective Products contained a defect in design causing nozzles to frequently become detached, become clogged, or require excessive force to discharge and causing a failure to activate during a fire emergency.  As alleged herein, the existence of the Product Defect and safety risk were material to Plaintiffs and Class members at all relevant times.

79.     At all times, Defendants are and were under a continuous duty to disclose to Plaintiffs and Class members the true standard, quality, and grade of the fire extinguishers at issue and to disclose the Product Defect and potential safety risk associated with the fire extinguisher failing to function during an emergency.

80.     Defendants knowingly, actively, and affirmatively concealed the facts alleged herein including the Product Defect.   Plaintiffs and Class members reasonably relied on Defendants' knowing, active, and affirmative concealment.

81.     For these reasons, all applicable statute of limitations have been tolled based on the discovery rule and Defendants' fraudulent concealment and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

82.     Plaintiff seeks to represent a class defined as all persons in the United States who purchased the Products (the "Class").   Excluded from the Class are persons who made such purchases for purpose of resale.

83.     Plaintiff also seek to represent a subclass of all Class Members who purchased the products in the State of California (the "California Subclass"). Excluded from the California Subclass are persons who made such purchases for purpose of resale.

84.     Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

85.     At this time, Plaintiff does not know the exact number of members of the aforementioned Class and California Subclass ("Class Members" and "California Subclass Members," respectively); however, given the nature of the claims and the number of retail stores in the United States selling Defendants' Products, Plaintiff believes that Class and California Subclass Members are so numerous that joinder of all members is impracticable.

86.     There is a well-defined community of interest in the questions of law and facts involved in this case.   Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class Members include:

(a) whether Defendants misrepresented and/or failed to disclose material facts concerning the Products;

(b) whether Defendants' conduct was unfair and/or deceptive;

(c) whether Defendants have been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendants to retain the benefits conferred upon Defendants by Plaintiff and the Class;

(d) whether Plaintiff and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages.

87.     With respect to the California Subclass, additional questions of law and fact common to the members that predominate over questions that may affect individual members include whether Defendants violated the California Consumers Legal Remedies Act as well as California's Unfair Competition Law.

88.     Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, purchased, in a typical consumer setting, Defendants' Products, and Plaintiff sustained damages from Defendants' wrongful conduct.

89.     Plaintiff is an adequate representative of the Class and the California Subclass because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of the Class members will be fairly and adequately protected by Plaintiff and his counsel.

90.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment

of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

## COUNT I
### (Violation of California's Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*)

91.     Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

92.     Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

93.     Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

94.     Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

95.     Civil Code § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

96.     Defendants violated Civil Code § 1770(a)(5), (a)(7), and (a)(9) by holding out Products as fit for use as fire extinguishers, when in fact the products were defective, dangerous, and useless.

97.     The Defect at issue here involves nozzles frequently becoming detached, becoming clogged, or requiring excessive force to discharge causing a failure to activate during a fire emergency.  This Defect affected Defendants' plastic handle fire extinguishers and push-button Pindicator fire extinguishers as identified throughout.

98.     Defendants have exclusive knowledge of the Defect, which was not known to Plaintiff or California Subclass Members.

99.     Defendants made partial representations to Plaintiff and California Subclass Members, while suppressing the Product Defect.  Specifically, by displaying the Products and describing their features, the product packaging and Defendants' website implied that the product was suitable for use as a fire extinguisher, without disclosing that the Products had a critical safety-related defect that could result in harm to users of the Products.

100.     Plaintiff and the California Subclass Members have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid.

101.     On February 10, 2021, prior to the filing of this Complaint, Plaintiff's counsel sent Defendants a CLRA notice letter, which complies in all respects with California Civil Code § 1782(a).  The letter was sent via certified mail, return receipt requested, advising Defendants that they were in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of Plaintiff and all other similarly situated purchasers.  Defendants responded to the letter on February 25, 2021.

102.     Plaintiff and the California Subclass Members seek all relief available under the CLRA, including restitution, the payment of costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court.

## COUNT II
### (Violation of California's Unfair Competition Law)

103.     Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

104.     Plaintiff brings this claim individually and on behalf of the proposed California Subclass against Defendants.

105.     By committing the acts and practices alleged herein, Defendants have violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the California Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

106.    Defendants have violated the UCL's proscription against engaging in unlawful conduct as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5) and (a)(7) as alleged above.

107.    Defendants' acts and practices described above also violate the UCL's proscription against engaging in fraudulent conduct.

108.    As more fully described above, Defendants' misleading marketing, advertising, packaging, and labeling of the Products is likely to deceive reasonable consumers.

109.    Plaintiff and the other California Subclass Members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent Defendants' unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Products, or by virtue of paying an excessive premium price for the unlawfully, fraudulently, and unfairly marketed, advertising, packaged, and labeled products.

110.    There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the defective nature of the Products.

111.    Plaintiff and the other California Subclass Members had no way of reasonably knowing that the Products they purchased were not as marketed, advertised, packaged, or labeled. Thus, they could not have reasonably avoided the injury each of them suffered.

112.    The gravity of the consequences of Defendants' conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the other California Subclass Members.

113.    Pursuant to California Business and Professional Code § 17203, Plaintiff and the California Subclass seek an order of this Court that includes, but is not limited to, an order requiring Defendants to (a) provide restitution to Plaintiff and the other California Subclass Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff's and the California Subclass' attorneys' fees and costs.

**COUNT III**
**(Fraud by Omission)**

114.    Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

115.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class and California Subclass against Defendants.

116.    This claim is based on fraudulent omissions concerning the safety of consumers who use the Products.  As discussed above, Defendants failed to disclose that the Products had a dangerous defect.

117.    The false and misleading omissions were made with knowledge of their falsehood. Defendants knew of reports of the Products' defective and dangerous nature.   Nonetheless, Defendants continued to sell their worthless fire extinguishers to unsuspecting consumers.

118.    The false and misleading omissions were made by Defendants, upon which Plaintiff and members of the proposed Class and California Subclass reasonably and justifiably relied, and were intended to induce and actually induced Plaintiff and members of the proposed Class and California Subclass to purchase the Products.

119.    The fraudulent actions of Defendants caused damage to Plaintiff and members of the proposed Class and California Subclass, who are entitled to damages and punitive damages.

**COUNT IV**
**(Unjust Enrichment)**

120.    Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

121.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class and California Subclass against Defendants.

122.    Plaintiff and Class Members conferred benefits on Defendants by purchasing the Products.

123.    Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff and Class Members' purchase of the Products.  Retention of those moneys under these

circumstances is unjust and inequitable because Defendants failed to disclose that the Products were unfit for use as fire extinguishers.  These omissions caused injuries to Plaintiff and Class Members because they would not have purchased the Products if the true facts were known.

124.    Retention of those moneys is unjust and inequitable because, as alleged above, Defendants commenced an ineffective recall that was calculated to result in few returns, and generally no refunds, thereby protecting profits Defendants collected from selling the defective products.

125.    Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and Class Members is unjust and inequitable, Defendants must pay restitution to Plaintiff and Class Members for their unjust enrichment, as ordered by the Court.

### COUNT V
**(Breach of Implied Warranty Under the Song-Beverly Act, Cal. Civ. Cod § 1790 *et seq*. and California Commercial Code § 2314)**

126.    Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

127.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class and California Subclass against Defendants.

128.    Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790. et seq., and California Commercial Code § 2314, every sale of consumer goods in this State is accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are merchantable, as defined in that Act.  In addition, every sale of consumer goods in this State is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purposes (here, to be used as fire extinguishers) and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

129.    The Products at issue here are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

130.    Plaintiff and the Class Members who purchased one or more Products are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

131.    Defendants are in the business of manufacturing, assembling, product and/or selling the Products to retail buyers, and therefore are a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

132.    Defendants impliedly warranted to retailer buyers that the Products were merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Products are used. For a consumer good to be "merchantable" under the Act, it must satisfy both of these elements. Defendants breached these implied warranties because the Products were unsafe and defective. Therefore, the fire extinguishers would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

133.    Plaintiff and Class Members purchased the Products in reliance upon Defendants' skill and judgment in properly packaging and labeling the Products.

134.    The Products were not altered by Plaintiff or Class Members.

135.    The Products were defective at the time of sale when they left the exclusive control of Defendants.  The Defect described in this complaint was latent in the product and not discoverable at the time of sale.

136.    Defendants knew that the Products would be purchased and used without additional testing by Plaintiff and Class Members.

137.    As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and Class Members have been injured and harmed because they would not have purchased the Products if they knew the truth about the Products, namely, that they were unfit for use as fire extinguishers.

//

//

//

//

## COUNT VI
### (Violation Of The Magnuson-Moss Warranty Act,
### 15 U.S.C. §§ 2301, *et seq.*)

138.    Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged above.

139.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class and California Subclass against Defendants.

140.    The Products are consumer products defined in 15 U.S.C. § 2301(1).

141.    Plaintiff and the Class and California Subclass Members are consumers as defined in 15 U.S.C. § 2301(3).

142.    Defendants are suppliers and warrantors as defined in 15 U.S.C. § 2301(4) and (5).

143.    In connection with the marketing and sale of the Products, Defendants impliedly warranted that the Products were fit for use as fire extinguishers.  The Products were not fit for use as fire extinguishers to the Defect described in the allegations above.

144.    By reason of Defendants' breach of warranties, Defendants violated the statutory rights due Plaintiff and the Class and California Subclass Members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*, thereby damaging Plaintiff and the Class and California Subclass Members.

145.    Plaintiff and the Class and California Subclass Members were injured as a direct and proximate result of Defendants' breach because they would not have purchased the Products if they knew the truth about the defective nature of the Products.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

a.   For an order certifying the nationwide Class and California Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and California Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and California Subclass Members;

b.  For an order declaring that Defendants' conduct violates the statutes referenced herein;

c.  For an order finding in favor of Plaintiff, the Class, and the California Subclass on all counts asserted herein;

d.  For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

e.  For pre-judgment interest on all amounts awarded;

f.  For an order of restitution, disgorgement, and all other forms of monetary relief;

g.  For an order awarding Plaintiff and the Class and California Subclass their reasonable attorneys' fees and expenses and costs of suit.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury of all issues so triable.

Dated:  June 7, 2021                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:  */s/ L. Timothy Fisher*

L. Timothy Fisher (State Bar No. 191626)
Blair E. Reed (State Bar No. 316791)
Sean L. Litteral (State Bar No. 331985)
 1990 North California Blvd., Suite 940
 Walnut Creek, CA  94596
 Telephone: (925) 300-4455
 Facsimile: (925) 407-2700
 Email: ltfisher@bursor.com
          breed@bursor.com
          slitteral@bursor.com

*Counsel for Plaintiff*